A00A2122. JORISCH v. RHYTHM FESTIVAL, INC.
(544 SE2d 459)

PHIPPS, Judge.

Paula Jorisch brought this negligence action against Rhythm Festival, Inc. (Rhythm) and Handicapped Driver Services, Inc. (HDS). Jorisch must use a wheelchair because she has cerebral palsy. While Rhythm was transporting Jorisch in a van which it had rented from HDS, the system securing Jorisch's wheelchair failed. As a result, the wheelchair toppled over. Jorisch sued to recover for personal injuries.

The trial court granted HDS's motion for directed verdict. The jury returned a verdict in favor of Rhythm. Although Jorisch was represented by counsel at trial, she filed this pro se appeal after her motion for new trial was denied. She contends that the court erred in finding a federal regulation promulgated under the Americans with Disabilities Act (ADA) inapplicable, in directing a verdict in favor of HDS, and in instructing the jury on contributory negligence. We find no error and affirm.

Jorisch attended a weekend music festival sponsored by Rhythm. Rhythm provided transportation for the disabled in a specially equipped van rented from HDS. Kathryn McKee drove the van. Throughout the weekend, McKee positioned Jorisch's wheelchair so that it was facing the rear of the van. According to Jorisch, her wheelchair rocked from side to side with such unusual force that she had to be held in place by a Rhythm employee while she was a passenger in the van. Jorisch testified that she therefore asked to be transported in another vehicle, but none was available. While the HDS van was being used to take Jorisch to the airport at the end of the festival, her wheelchair fell backward and landed on an adjacent wooden seat. Jorisch averred that the Rhythm employee who had been holding her had gone to the front of the van to give the driver directions. In her testimony, McKee denied that Jorisch's wheelchair had ever been rocking sideways or that Jorisch had to be held in place during operation of the van.

HDS's van is equipped with a wheelchair tie-down system which includes two tracks running from the front to the rear of the van. Wheelchairs are held to one track or the other with a strap which has a clip and spring on one end and two hooks on the other end. The hooks are fastened to the wheelchair and the clip is attached to the track, causing the spring and strap to tighten. Jorisch's wheelchair toppled over because the clip became unattached from the track. McKee described this to Jorisch as a mechanical failure or defect.

Michael Dresdner, HDS's owner, purchased the van's wheelchair securement system from Creative Controls, Inc. (CCI). The system came equipped with lap belts and shoulder harnesses, but HDS installed only the lap belts. In her complaint, Jorisch charged HDS with negligence in failing to install the shoulder harnesses and in certain other regards. She charged Rhythm with negligence in failing to secure her properly in the van.

1. HDS has filed a motion to dismiss this appeal as to it, on grounds that Jorisch filed the appeal following denial of her motion for new trial and did not challenge the grant of HDS's motion for directed verdict in her new trial motion. Because a party on appeal is

not limited to the grounds urged in her motion for new trial,[1] HDS's motion to dismiss is denied.

Additionally, HDS argues that, in her enumeration of errors, Jorisch has not properly preserved the issues she seeks to raise on appeal. In considering whether Jorisch has preserved issues for appellate review,

> we are guided by the general rule that "(p)ro se pleadings are held to less stringent standards than pleadings that are drafted by lawyers" ([cit.]), and by the statutory provision that "(w)here it is apparent from the notice of appeal, the record, the enumeration of errors, or any combination of the foregoing . . . what errors are sought to be asserted upon appeal, the appeal shall be considered in accordance therewith notwithstanding . . . that the enumeration of errors fails to enumerate clearly the errors sought to be reviewed." [Cit.][2]

We review the issues raised by Jorisch in accordance with these standards.

2. The first issue for decision is whether the trial court erred in granting HDS's motion in limine to exclude evidence concerning or reference to an ADA regulation requiring the provision of shoulder harnesses for wheelchair users.

(a) In resolving this issue, we are presented with highly technical questions concerning interpretation of regulations enforcing the ADA. These regulations are codified in Parts 37 and 38 of Title 49 of the Code of Federal Regulations. The purpose of Part 37 is to implement the transportation provisions of Titles II and III of the ADA.[3] The purpose of Part 38 is to provide minimum guidelines and requirements for accessibility standards in Part 37 for transportation vehicles required to be accessible by the ADA.[4]

The regulation at issue, 49 CFR § 38.23 (d) (7), was promulgated under Title III of the ADA. Section 38.23 (d) (7) provides, among other things, that entities which provide or operate designated transportation services or systems must furnish a shoulder harness as well as a seat belt for each wheelchair provided in vehicles used to transport disabled passengers. The initial question is whether HDS is an entity which provides transportation services or operates a transportation system within the meaning of the regulations set

---

[1] OCGA § 5-5-40 (g).
[2] *Cotton v. Bank South*, 212 Ga. App. 1, 3 (1) (440 SE2d 704) (1994).
[3] 49 CFR § 37.1.
[4] 49 CFR § 38.1.

forth in Part 37.

In enacting the ADA, Congress provided:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce.[5]

Section 37.21 (a) (2) of Title 49 of the regulatory code enforces this provision of the ADA by applying Part 37 to "[a]ny private entity that provides specified public transportation." Section 37.3 defines "[s]pecified public transportation" as meaning "transportation by bus, rail, or any other conveyance (other than aircraft) provided by a private entity to the general public, with general or special service (including charter service) on a regular and continuing basis."

Section 37.21 (a) (3) of Title 49 applies Part 37 to "[a]ny private entity that is not primarily engaged in the business of transporting people but operates a demand responsive or fixed route system." Section 37.3 defines "[d]emand responsive system" as meaning

> any system of transporting individuals, including the provision of designated public transportation service by public entities and the provision of transportation service by private entities, including but not limited to specified public transportation service, which is not a fixed route system.

Section 37.3 defines "fixed route system" as one "on which a vehicle is operated along a prescribed route according to a fixed schedule." Under 49 CFR § 37.23 (d),

> [a] private entity that provides fixed route or demand responsive transportation service under contract or other arrangement with another private entity shall be governed, for purposes of the transportation service involved, by the provisions of [Part 37] applicable to the other entity.

HDS modifies vehicles for disabled individuals and also leases and rents modified vehicles for use by commercial entities in transporting disabled passengers. Therefore, HDS provides transportation vehicles to private individuals and to entities which provide transportation services. HDS does not provide "specified public transportation service" or operate a "demand responsive or fixed route sys-

---

[5] 42 USCA § 12184.

tem," within the meaning of 49 CFR §§ 37.3; 37.21 (a) (2), (3); or 37.23 (d).

(b) Jorisch argues that 49 CFR § 38.23 (d) (7) nonetheless applies to Rhythm under §§ 37.171 and 38.171. Jorisch's reliance on these regulations is misplaced.

Subsection (a) of 49 CFR § 38.171 states that new, used, and remanufactured vehicles for systems not covered by other subparts of Part 38, to be considered accessible by regulations in Part 37, shall comply with subpart H (§§ 38.171 through 38.179). Even if § 38.171 was applicable here, it does not appear that there has been a violation of any of the sections in subpart H.

Section 37.171 states that

> [a] private entity not primarily engaged in the business of transporting people which operates a demand responsive system shall ensure that its system, when viewed in its entirety, provides equivalent service to individuals with disabilities, including individuals who use wheelchairs, as it does to individuals without disabilities.

Section 37.171 also provides that the standards of § 37.105 shall be used to determine if the entity is providing "equivalent service." The standards set forth in § 37.105 concern service features such as fares, service availability, and geographic areas of service. Section 37.105 does not embrace the accessibility standards set forth in Part 38.

Consequently, the trial court did not err in finding 49 CFR § 38.23 (d) (7) inapplicable to HDS.

3. In reliance on *Hansen v. Abrasive Engineering &c.*,[6] Jorisch argues that even if the ADA does not govern HDS's activities, its applicability to Rhythm provides a basis for finding HDS negligent in failing to comply with its safety standards.

In *Hansen*, an industrial worker who had been injured while cleaning a machine brought a negligence action against the manufacturer of the machine for failing to incorporate features consistent with safety rules promulgated under the federal Occupational Safety and Health Act (OSHA). Even though OSHA applied to the plaintiff's employer and not to the manufacturer, the Oregon Supreme Court held that the safety rules were relevant to the standard of care applicable to the manufacturer because it designed and manufactured the machine for use by an employer who was governed by the rules.

The question thus presented is whether HDS outfitted its van for use by an entity governed by the ADA. Rhythm, which is now defunct, sponsored music festivals. Because Jorisch failed to present

---

[6] 317 Ore. 378 (856 P2d 625) (1993).

any evidence that Rhythm provided transportation to the public on a regular and continuing basis, Rhythm cannot be considered a "private entity that provide[d] specified public transportation" under 49 CFR § 37.21 (a) (2). It is, however, arguable that Rhythm was a "private entity . . . not primarily engaged in the business of transporting people but operat[ing] a demand responsive . . . system" under § 37.21 (a) (3). But under § 37.101 (e), private entities providing demand responsive transportation are not required to ensure that new vehicles with a seating capacity of 16 or fewer are accessible to individuals with wheelchairs. Because it is undisputed that the van which Rhythm rented from HDS had a seating capacity of fewer than 16 people, § 38.23 (d) (7) did not apply to Rhythm here.

4. And even if we were to find 49 CFR § 38.23 (d) (7) in some way applicable, it does not appear from the parties' references to the record that Jorisch has presented sufficient evidence to establish a causal relationship between the absence of a shoulder harness and the mishap causing her injuries.

In her testimony, Jorisch acknowledged that the purpose of a shoulder harness is to secure the passenger within the wheelchair rather than to secure the wheelchair to the floor and that she remained in the wheelchair even after it toppled over. Jorisch later testified that it was her understanding that the wheelchair would not have fallen if there had been a shoulder harness. But she has admitted that her understanding of the reasons for the fall was based on explanations provided by others. And she has cited no testimony from any other witness or other evidence showing or indicating that the presence of a shoulder harness would have prevented the fall of the wheelchair. To the contrary, an instruction booklet provided by CCI for its wheelchair securement system indicates that the wheelchair is secured to the floor by means other than the shoulder harness.

5. There is no merit in Jorisch's argument that the instruction booklet provides evidence that installation of shoulder harnesses by owners of commercial disability vans is standard practice in the industry.

The booklet contains merely a photograph of a wheelchair occupant using a shoulder harness, but in no way indicates that provision of shoulder harnesses is a standard industry practice. Evidence to the contrary was presented by HDS and was not rebutted by Jorisch.

6. At trial, Jorisch also sought a recovery for negligence by HDS based on theories that there was a defect in the wheelchair securement system which HDS failed to correct and that HDS failed to reasonably inspect the van prior to renting it to Rhythm. The trial court found no evidence in support of these allegations. Neither do we.

Although McKee theorized that the strap securing the wheel-

chair to the tracking system may have caused the spring to come loose because the strap was worn, she testified that there was nothing in the appearance of the strap that provided any indication it would not function properly. HDS's OSHA compliance officer, Kenneth Johnson, testified without contradiction that HDS had no prior complaints that the securement system in the van was not working properly, that the van was inspected prior to being rented to Rhythm, and that the securement system was found to be in good working order. Although Johnson could not recall whether he or another HDS employee conducted the inspection, he identified a pre-rental inspection form which documented that the inspection had been performed. Testimony given by both Johnson and Dresdner showed that after the van was returned by Rhythm, HDS again inspected the tie-down system, found no defects, and continued to rent the van without incident. This testimony was not contradicted by Jorisch, as she did not conduct an inspection of the van's wheelchair securement system for defects before or after the accident.

7. Finally, Jorisch contends that the trial court erred in instructing the jury on contributory negligence under North Carolina law.

The accident in this case occurred while Rhythm was using the van to transport Jorisch in North Carolina. HDS rented the van to Rhythm in Georgia. Therefore, it could be argued that the substantive tort law of either state should be applied.[7] Because Jorisch did not object to the complained-of jury instruction, she has waived her challenge to the court's application of North Carolina law.[8]

*Judgment affirmed. Johnson, P. J., and Smith, P. J., concur.*

DECIDED JANUARY 5, 2001 —

Paula Jorisch, *pro se.*

*Dennis, Corry & Porter, Thomas D. Trask, Noah H. Pines, Gorby, Reeves, Peters & Burns, J. Franklin Burns, Christine A. Carson,* for appellee.

---

[7] See *Young v. W. S. Badcock Corp.*, 222 Ga. App. 218, 219 (1) (474 SE2d 87) (1996).
[8] See *Tyler v. Bennett*, 215 Ga. App. 87, 88 (2) (449 SE2d 666) (1994); OCGA § 5-5-24 (a).