## A09A1636. PINKINS v. THE STATE.
### (684 SE2d 275)

BLACKBURN, Presiding Judge.

Following a jury trial, Bryan Pinkins was convicted on two counts of armed robbery,[1] two counts of aggravated battery,[2] three counts of kidnapping,[3] three counts of aggravated assault,[4] and one count of possession of a firearm during the commission of a crime.[5] The trial court subsequently vacated Pinkins's convictions for kidnapping, but denied his motion for a new trial on the remaining charges. Pinkins now appeals from that order, arguing that the trial court erred in denying his motion to suppress the victims' pre-trial identification of him from a photographic police lineup. We disagree and affirm.

> Unless the evidence demands a finding contrary to a judge's determination, we will not reverse a ruling denying a motion to suppress. Additionally, convictions based on a pretrial identification by photograph and a subsequent identification at trial will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. A court need not consider whether there was a substantial likelihood for misidentification if it finds that the identification procedure was not

---

[1] OCGA § 16-8-41 (a).
[2] OCGA § 16-5-24 (a).
[3] OCGA § 16-5-40 (a).
[4] OCGA § 16-5-21 (a).
[5] OCGA § 16-11-106 (b) (1).

> impermissibly suggestive. An identification procedure becomes impermissibly suggestive when it leads the witness to an all but inevitable identification of the defendant as the perpetrator, or is the equivalent of the authorities telling the witness, "This is our suspect."

(Punctuation omitted.) *Rutland v. State.*[6]

This case arose out of the armed robbery of a Petro gas station and convenience store managed by Mohammed Afridi. Viewed in the light most favorable to the verdict, *Drammeh v. State,*[7] the evidence shows that late on the evening of October 26, 2005 Afridi was working at the station with his wife and son. Afridi's son left the convenience store to take a reading of the gas pumps and re-entered the store a short time later, accompanied by a masked man holding a gun to his head. Afridi complied with the gunman's demand that he unlock the door to the area containing the store's cash register. The gunman then hit Afridi over the head, pushed both Afridi and his wife to the floor, and demanded that Afridi's son open the cash register and give him the money contained therein. The son complied and gave the gunman approximately $3,000 from the register. The gunman then forced Afridi, his son, and his wife into a back storage room of the store and ordered them to lie face-down on the floor, with their hands behind their heads. He robbed both men of their wallets, each of which contained cash and credit cards, and he also robbed Afridi of his cell phone. The gunman then returned to the front part of the store, where the Afridis overheard him talking on what they believed to be a cell phone, discussing whether he should shoot them. Fearing that the gunman was about to kill his family, Afridi's son got up and began to close the door that separated the storage room from the front of the store. The gunman then fired five shots at the storage room door, two of which hit Afridi's son, causing him serious injury. The gunman fled the scene, and the Afridis contacted police.

Each of the Afridis gave officers a general physical description of the gunman, including his race and estimated height and weight. Because the perpetrator had been wearing a ski mask, however, the victims could not describe his facial features, other than his eyes. They described the gunman's eyes as "slanted," "catlike," and "Chinese."

During their investigation, police found a man's wallet on the public sidewalk a few doors down from the Petro station. The wallet contained Pinkins's driver's license and credit cards, as well as two other forms of picture identification belonging to Pinkins. Because

---

[6] *Rutland v. State*, 296 Ga. App. 471, 473-474 (2) (675 SE2d 506) (2009).
[7] *Drammeh v. State*, 285 Ga. App. 545, 546 (1) (646 SE2d 742) (2007).

both the picture and the physical description on Pinkins's driver's license appeared to match the general description of the robber given by the Afridis, the police investigated Pinkins as a possible suspect.

As part of their investigation, the police showed each of the Afridis a photographic lineup, which included photographs of Pinkins and five other males. The State unsuccessfully attempted to obtain a copy of Pinkins's driver's license photograph from the state Department of Motor Vehicles for use in the lineup. When they could not obtain an actual photograph, the police used a photocopy of the picture on Pinkins's driver's license, enlarging it so that it was approximately the same size as the other photographs in the lineup. Because it was an enlarged photocopy, however, the lineup picture of Pinkins did have a slightly lighter background and was slightly lighter in appearance than the other photographs. Pinkins's picture was also slightly smaller than the others, and was grainier and less focused.

The Afridis were each shown the lineup separately, and they were kept separated during the time it took for all of them to review the same. The police officer who conducted the lineup made no comments or suggestions to any of the victims. Rather, prior to showing each of the victims the photographs, the officer read a standard admonition, which provided:

> [This] group of photographs may or may not contain a picture of the person who committed the crime now being investigated. The fact that photographs are shown to you should not cause you to believe that the guilty person has been caught. It is just as important to clear innocent persons from suspicion as it is to identify those believed guilty. Remember, when viewing a group of photographs, you should consider the lighting and how it may affect the complexion of some persons, making them appear lighter or darker. You should also consider the fact that hair styles, facial hairs, scars, marks, et cetera, can easily be changed, added, or taken away. Finally, do not allow yourself to be distracted by any background scenery, since photographs are sometimes taken at various locations or obtained from a variety of sources. Please take your time and study the photographs carefully. Do not allow yourself to be influenced by any police officer present.

Each of the Afridis picked Pinkins's photograph from the lineup, identifying him as the gunman who had robbed and assaulted them.

Pinkins filed a motion for a new trial and, after a hearing on the same, the trial court vacated his convictions for kidnapping but

denied his motion as to the remaining charges. Pinkins now appeals from that order.

Pinkins claims he is entitled to a new trial on the remaining charges because the trial court erred in denying his motion to suppress the victims' pre-trial photographic identification of him. Specifically, Pinkins asserts that the photographic array used was impermissibly suggestive because: (1) he was the only person pictured who had slanted or characteristically Asian eyes; and (2) his photograph differed from the other five in that it was smaller, lighter in color, grainier, and less-focused, and because his head was more tilted than those of the other men whose pictures were used in the lineup. Pinkins also argues that because the victims could only see his eyes during the robbery, the lineup photographs should have been altered to obscure all facial features other than the eyes. These arguments are without merit.

In determining whether an identification procedure was fair, the question is not whether the array of photographs used by police could "have been more nearly perfect." *Payne v. State*.[8] Rather, as noted above, "the test is whether the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (Punctuation omitted.) *Smith v. State*.[9] A review of the evidence, including the photographic array at issue, shows "that the trial court was authorized to find that the lineup was not impermissibly suggestive of [Pinkins] as a suspect." *Pace v. State*.[10]

With respect to physical appearance, the record shows that the photographic lineup included pictures of six males, all of whom were similar in age to Pinkins and who had the same general facial features and complexion. At least three of the men pictured had what could be considered slanted or characteristically Asian eyes. Moreover, any slight variations in the facial features among the men pictured would have been insufficient to render the lineup impermissibly suggestive. See, e.g., *Williams v. State*[11] (differences between defendant's hairstyle and facial hair and those worn by others pictured did not taint lineup); *Marshall v. State*[12] (lineup not tainted by fact that the hair length and complexions of some individuals pictured differed from those of defendant).

Nor did the physical differences in the photographs themselves (as opposed to the persons pictured in the photographs) taint the

[8] *Payne v. State*, 233 Ga. 294, 300 (II) (210 SE2d 775) (1974).
[9] *Smith v. State*, 209 Ga. App. 540, 543 (4) (433 SE2d 694) (1993).
[10] *Pace v. State*, 272 Ga. App. 16, 18 (3) (611 SE2d 694) (2005).
[11] *Williams v. State,* 275 Ga. 622, 623 (2) (571 SE2d 385) (2002).
[12] *Marshall v. State*, 233 Ga. App. 573, 575-576 (2) (a) (504 SE2d 764) (1998).

lineup. This Court has repeatedly held that slight differences in the size, shading, or clarity of photographs used in an identification lineup will not render the lineup impermissibly suggestive. See, e.g., *Williams v. State*[13] ("we have previously rejected the argument that the lighter picture tone of the suspect renders a photographic lineup impermissibly suggestive"); *Karim v. State*[14] (fact that defendant's picture was lighter in tone and slightly smaller than other photographs in lineup did not make lineup impermissibly suggestive); *Taylor v. State*[15] (photographic lineup was not impermissibly suggestive simply because the co-defendants' photographs differed from the other pictures in the lineup, having lighter backgrounds and not showing the height designation present on the other pictures); *Cheeves v. State*[16] (fact that photographs used in an identification lineup differed as to their backgrounds, color tone, and size did not render lineup impermissibly suggestive). Similarly, the fact that Pinkins's picture showed him with his head more tilted than any of the other men pictured in the lineup did not render the photographic array impermissibly suggestive. See *Widner v. State*.[17]

Finally, Pinkins fails to explain how the "full-face" lineup conducted here (as opposed to an altered lineup, obscuring all facial features other than the eyes) was impermissibly suggestive. While the altered photographic lineup advocated by Pinkins has been found permissible (see *Jackson v. State*[18]), he cites no authority to support his argument that such an altered lineup was the only option available to police.

With respect to the identification process, the record reflects that each of the Afridis "independently identified [Pinkins's] photograph as [that of] the perpetrator out of the immediate presence of the other[s] and without being coached by the police." *Brewer v. State*.[19] The evidence further showed that, with respect to each victim,

> the detective [conducting the lineup] made no statement or suggestion . . . as to whether they had a suspect in the case, nor did detectives single out a particular photograph for [any victim's] attention. And in each case, police read . . . a pre-printed admonition to the witness indicating that the

---

[13] *Williams v. State*, 264 Ga. App. 115, 117 (1) (589 SE2d 676) (2003).

[14] *Karim v. State*, 244 Ga. App. 282, 285-286 (2) (535 SE2d 296) (2000).

[15] *Taylor v. State*, 203 Ga. App. 210, 211 (2) (416 SE2d 554) (1992).

[16] *Cheeves v. State*, 157 Ga. App. 566 (1) (278 SE2d 148) (1981).

[17] *Widner v. State*, 203 Ga. App. 823, 824 (1) (418 SE2d 105) (1992).

[18] *Jackson v. State*, 288 Ga. App. 339, 345 (3) (654 SE2d 137) (2007).

[19] *Brewer v. State*, 219 Ga. App. 16, 20 (6) (463 SE2d 906) (1995).

lineup may or may not contain a picture of the person who committed the crime.

*Allen v. State.*[20]

Because "there [was] no indication that the procedures used in showing the victim[s] the photographic display were improper" and because the individuals "whose photographs were displayed with [Pinkins's] shared many of his general physical characteristics," the trial court properly concluded that the lineup procedure was not impermissibly suggestive. *Herndon v. State.*[21] See also *Brewer*, supra, 219 Ga. App. at 20 (6). We therefore affirm the trial court's order denying Pinkins's motion for a new trial.

*Judgment affirmed. Adams and Doyle, JJ., concur.*

DECIDED SEPTEMBER 2, 2009.

*Mary Erickson*, for appellant.
*Gwendolyn Keyes Fleming*, District Attorney, *Daniel J. Quinn, Assistant District Attorney*, for appellee.

[20] *Allen v. State*, 268 Ga. App. 519, 529 (3) (602 SE2d 250) (2004).
[21] *Herndon v. State*, 232 Ga. App. 129, 131 (1) (499 SE2d 918) (1998).